JN/ABS:JF/AE
F. #2020R01145

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

PETER KHAIM and
ARKADIY KHAIMOV,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

## 1:20-cr-00580(AMD)(RML)

S U P E R S E D I N G
I N D I C T M E N T

Cr. No.  20-580 (AMD)
(T. 18, U.S.C., §§ 982(a)(1), 982(a)(7),
982(b)(1), 1028A(a)(1), 1028A(b),
1028A(c)(5), 1349, 1956(a)(1)(B)(i),
1956(h), 2 and 3551 et seq.; T. 21, U.S.C.,
§ 853(p))

THE GRAND JURY CHARGES:

### INTRODUCTION

      At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.    Background

    A.    New York Law Governing the Provision of Pharmacy Services

        1.    The provision of pharmacy services in New York State was governed by Article 137 of the New York Education Law ("Article 137"), which regulated the profession of pharmacy, Article 33 of the New York Public Health Law ("Article 33") and the Rules of Professionalism set by the New York State Board of Regents ("Rules of Professionalism"), among others.

        2.    Article 137 provided, inter alia, that no person or entity was permitted to offer prescription drugs for sale unless registered as a pharmacy by the New York State Department of Education ("Department of Education").   Persons or entities that wished to obtain a pharmacy registration were required to submit an Application for Initial Registration or

Transfer of Ownership of Pharmacy (the "New York Pharmacy Application"), also known as "Form PH 200," which form was dictated by the Department of Education.

3.      The New York Pharmacy Application required each applicant to provide the full name and certain requested information for each corporate officer, partner or member, as well as the full name and certain requested information for each owner or principal stockholder (owning 10 percent or more of corporate stock) of the pharmacy.   The registrant (an individual owner, partner, corporate officer, member or other authorized person) was required to attest that he or she "affirm[ed] under penalty of perjury that the answers and statements that he/she [] made in the [] application [were] true and [] made and given with the intent of having the [Department of Education] and the New York State Board of Pharmacy rely on the truth thereof" in determining whether to grant the application.

4.      Article 137 provided, inter alia, the following requirements for pharmacies:

(a)      All prescription drugs were required to be dispensed by a licensed pharmacist;

(b)      Only a licensed person was permitted to practice pharmacy or use the title "pharmacist" (with a limited number of exceptions not applicable here); and

(c)      If the owner of a pharmacy was not a licensed pharmacist and thereby not capable of personally supervising the pharmacy, the licensed pharmacist who had personal supervision of the pharmacy (the "Supervising Pharmacist") was required to be named on the pharmacy registration.   If such licensed pharmacist no longer had personal supervision of the pharmacy, the owner was required to notify the Department of Education of that fact and provide information for a new Supervising Pharmacist.

5.     The Rules of Professionalism provided that, among other responsibilities, a Supervising Pharmacist of a New York State-registered pharmacy was required to have:

(a)     ensured that either the Supervising Pharmacist or another licensed pharmacist was physically on the premises of the pharmacy at all times that the pharmacy was open for business;

(b)     refrained from delegating professional responsibilities to a person whom the Supervising Pharmacist or otherwise licensed pharmacist knew was not qualified to perform them; and

(c)     notified the New York State Board of Pharmacy within seven days of any change in the identity of the Supervising Pharmacist.

B.     The Health Care Benefit Programs

6.     The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were at least 65 years old or disabled.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").   Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

7.     Medicare was divided into multiple parts.   Medicare Part D provided prescription drug coverage to persons who were eligible for Medicare.

8.     Medicare beneficiaries obtained Part D benefits in two ways: (a) by joining a prescription drug plan, which covered only prescription drugs, or (b) by joining a Medicare Advantage Plan, which covered both prescription drugs and medical services (collectively, "Part D Plans").   Part D Plans were operated by private companies, often referred to as drug plan "sponsors," that were approved by Medicare ("Medicare Drug Plan Sponsors").

3

9.      Medicare and Medicare Drug Plan Sponsors were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

10.     CMS assigned pharmacies a national provider identification number ("NPI").   A pharmacy dispensing medications to a beneficiary used its assigned NPI when submitting a claim for reimbursement under Medicare Part D.   A pharmacy was permitted to submit claims for reimbursement under Part D only for medications that were medically necessary and actually dispensed.   A pharmacy was required to maintain records verifying that it dispensed the medications.

11.     The Medicaid Program ("Medicaid") in New York State was a federally and state funded health care program providing benefits to individuals and families who met specified financial and other eligibility requirements, and to certain other individuals who lacked adequate resources to pay for medical care.   CMS was responsible for overseeing the Medicaid program in participating states, including New York.   Individuals who received benefits under Medicaid, like those who received benefits under Medicare, were referred to as "beneficiaries."

12.     In New York State, Medicaid provided prescription drug coverage to its beneficiaries.   Medicaid beneficiaries could obtain their prescription drug benefits from pharmacies either through "fee-for-service" plans or through "Medicaid Managed Care Plans," which were plans administered by private insurance companies that were paid by Medicaid.

13.     Medicaid and Medicaid Managed Care Plans were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

14.     A pharmacy could participate in the Medicare Part D program and Medicaid (collectively, the "Prescription Drug Plans") by entering into an agreement: (a) directly with a Prescription Drug Plan; (b) with one or more Pharmacy Benefit Managers ("PBMs"); or

4

(c) with a Pharmacy Services Administration Organization ("PSAO").   A PBM acted on behalf of one or more Prescription Drug Plans.   Through a Prescription Drug Plan's PBM, a pharmacy could join a Prescription Drug Plan's network.   A PSAO contracted with PBMs on behalf of the pharmacy.

15.     Typically, a beneficiary enrolled in a Prescription Drug Plan obtained prescription medications from a pharmacy authorized by the beneficiary's Prescription Drug Plan.   After filling a beneficiary's prescription, the authorized pharmacy submitted the claim either directly to a Prescription Drug Plan or to a PBM that represented the Prescription Drug Plan.   The pharmacy provided, among other things, the beneficiary's identification number, the identification number of the medical professional who ordered the prescription and the pharmacy's identification number, such as the NPI, with the claim.   The Prescription Drug Plan or the PBM determined whether the pharmacy was entitled to payment for each claim.   Then, the Prescription Drug Plan or PBM, either directly or indirectly, reimbursed the pharmacy for the claim.

C.     Targretin and Panretin

16.     Cutaneious T-Cell Lymphoma was a rare disease, accounting for under approximately five percent of all cases of non-Hodgkin's Lymphoma, that primarily affected the skin.   Targretin was a drug used to treat skin problems arising from Cutaneious T-Cell Lymphoma.

17.     In or around June 2000, Targretin Gel 1% was approved as a new dosage form for Targretin by the U.S. Food and Drug Administration (the "FDA") as a priority drug for the topical treatment of cutaneous lesions in patients with Cutaneious T-Cell Lymphoma (stage

IA and IB) who had refractory or persistent disease after other therapies or who had not tolerated other therapies.

18.     The use of Targretin Gel 1% was medically necessary only if other skin-directed therapies had failed or were contra-indicated for a particular patient.

19.     Panretin was a drug used to treat certain skin lesions in Kaposi sarcoma, a type of cancer related to Acquired Immunodeficiency Syndrome ("AIDS").

20.     In or around February 1999, Panretin Gel 0.1% was approved by the FDA for the topical treatment of cutaneous lesions in patients with AIDS-related Kaposi's sarcoma.

21.     Targretin Gel 1% and Panretin Gel 0.1% were not legitimate treatments for the disease caused by the coronavirus that was discovered in or about December 2019 ("COVID-19") or any side effects of COVID-19.

22.     The Average Wholesale Price for Targretin Gel 1% was in excess of approximately $34,000 for each 60 gram tube.

23.     Due to the relative expense of Targretin Gel 1% and Panretin Gel 0.1%, the Prescription Drug Plans imposed prior authorization requirements before permitting pharmacies to be reimbursed for dispensing these drugs.   Prior authorization was a requirement that a health care provider obtain advance approval from the Prescription Drug Plans to dispense a prescription drug before submitting a claim for reimbursement.   Pursuant to the requirement, the pharmacy would be paid for dispensing Targretin Gel 1% and Panretin Gel 0.1% only if the prescription drug for the beneficiary was pre-approved by the beneficiary's Prescription Drug Plan.

6

D.      Special Requirements for Dispensing Medications in a Disaster or Emergency

24.      The United States Code of Federal Regulations subjected Prescription

Drug Plans to special requirements during a disaster or emergency.   See 42 CFR 422.100(m).

A declaration by the governor of a state or protectorate was one of the triggering events for these

special requirements.

25.      On or about January 31, 2020, as a result of the spread of COVID-19

within the United States, the HHS Secretary declared a national public health emergency, and, on

or about March 13, 2020, the President of the United States issued Proclamation 9994 declaring

a national emergency retroactive to March 1, 2020.   See 85 Fed. Reg. 15,337.   At that time, the

President of the United States determined that COVID-19 was of sufficient severity and

magnitude to warrant an emergency determination under Section 501(b) of the Robert T.

Stafford Disaster Relief and Emergency Assistance Act, pursuant to Title 42, United States

Code, Sections 5121-5207.   As of December 2020, declarations had been made regarding the

COVID-19 public health emergency in all 50 States, the District of Columbia and the U.S.

Territories, thus triggering the special requirements that are applicable to Prescription Drug

Plans.

26.      These special requirements were designed to ensure that beneficiaries

received access to their prescription drug benefits during a disaster or emergency, such as the

COVID-19 pandemic.   Prescription Drug Plans were required to, inter alia, waive prior

authorization requirements during a disaster or emergency, including during the COVID-19

public health emergency.

27.      A pharmacy that had failed to comply with otherwise applicable

requirements could bill for prescription drugs that were purportedly dispensed to beneficiaries

during a state of disaster or emergency by using certain billing codes (an "Emergency Override Code"). One Emergency Override Code allowed a pharmacy to bill and receive reimbursement for prescription drugs, such as Targretin Gel 1% and Panretin Gel 0.1%, without receiving the prior authorization that was generally required.

28.     In addition, during a public health emergency as described in Section 1135(g)(1)(B) of the Social Security Act, pursuant to Section 3714 of the Coronavirus Aid, Relief and Economic Security ("CARES") Act, as implemented by CMS, Prescription Drug Plans were required to relax "refill-too-soon" edits ("Refill-Too-Soon Edits"). Refill-Too-Soon Edits typically prevented a pharmacy from billing for dispensing multiple prescriptions of the same medication, such as Targretin Gel 1% and Panretin Gel 0.1%, to a single beneficiary within a single 30-day period. Pursuant to Section 3714 of the CARES Act, however, Prescription Drug Plans were required to suspend all quantity and days' supply limits under 90 days for all covered Medicare Part D drugs, except for certain exceptions not applicable here.

E.     The Defendant and Relevant Entities

29.     The defendant PETER KHAIM was a resident of Forest Hills, New York.

30.     The defendant ARKADIY KHAIMOV was a resident of Forest Hills, New York, and the defendant PETER KHAIM's younger brother.

31.     Money Launderer 1, an individual whose identity is known to the Grand Jury, was an international money launderer.

32.     The defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, owned, controlled and operated the following sixteen companies, which were formed and incorporated under New York State law (the "Scheme Pharmacies"):

(a)     Spring RX was a New York company located at 111-50 Springfield Boulevard, Queens Village, New York;

(b)     Zone Pharmacy was a New York company located at 125-20 111th Avenue, Jamaica, New York;

(c)     GAF Pharmacy was a New York company located at 98-100 E. 165th Street, Bronx, New York;

(d)     Manipal Drugs was a New York company located at 280 Nostrand Avenue, Brooklyn, New York;

(e)     LPM Pharmacy was a New York company located at 7537 Main Street, Flushing, New York;

(f)     Sterling Drugstore was a New York company located at 116-22A Metropolitan Avenue, Richmond Hill, New York;

(g)     SEY Drugs Inc., which also operated as "Jamaica Pharmacy," was a New York corporation located at 8924 163rd Street, Jamaica, New York;

(h)     JP RX, which also operated as "Maccabi Pharmacy," was a New York company located at 7618 Jamaica Avenue, Jamaica, New York;

(i)     Merrick RX Inc., which also operated as "Burns Pharmacy," was a New York corporation located at 6804 Burns Street, Forest Hills, New York;

(j)     IVS Pharmacy was a New York company located at 185-08 Union Turnpike, Suite 109, Fresh Meadows, New York;

(k)     1105 JTP LLC, which also operated as "Genome Pharmacy," was a New York company located at 1105 Jericho Turnpike, New Hyde Park, New York;

(l)     Shreeman Pharmacy Inc., which also operated as "Genome Pharmacy," was a New York corporation located at 1105 Jericho Turnpike, New Hyde Park, New York;

(m)     Malvina Drug Corp. was a New York corporation located at 300 Hempstead Turnpike, Suite 214, West Hempstead, New York;

(n)     Merrick Wellness was a New York company located at 126-14 Merrick Boulevard, Suite F, Jamaica, New York;

(o)     Albertson Pharmacy was a New York company located at 1028 Willis Avenue, Albertson, New York; and

(p)     Howard Beach Pharmacy LLC, which also operated as "OrgaNYC," was a New York company located at 133-40 79th Street, Howard Beach, New York.

33.     The Scheme Pharmacies were registered with the New York State Office of the Professions as pharmacy establishments.

34.     Money Launderer 1 owned, controlled and operated the companies that were used to launder the proceeds of the fraudulent scheme obtained by the Scheme Pharmacies (the "Pass-Through Entities").   Many of the Pass-Through Entities contained the word "wholesale" in their name or were purposefully named after legitimate pharmaceutical wholesale companies.

II.    The Illegal Schemes

    A.    The Fraudulent Scheme

35.     From in or about and between August 2018 and August 2020, the defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, obtained

ownership and control of the Scheme Pharmacies by creating new corporations under New York

State law and acquiring pre-existing pharmacies. KHAIM and KHAIMOV concealed and

disguised their involvement in the Scheme Pharmacies by paying nominee owners to open bank

accounts for the Scheme Pharmacies and by falsely representing their respective ownership

rights to the Scheme Pharmacies, when in fact KHAIM and KHAIMOV owned and controlled

the Scheme Pharmacies and the associated bank accounts. KHAIM and KHAIMOV used the

nominee owners' means of identification, including, but not limited to, the nominee owners'

names and signatures, to, among other things, submit New York Pharmacy Applications, open

bank accounts and receive and transfer the proceeds of the fraudulent scheme.

36. The defendants PETER KHAIM and ARKADIY KHAIMOV, together

with others, also paid licensed pharmacists to act as Supervising Pharmacists of the Scheme

Pharmacies in name only, when in fact these individuals never performed the duties of a

Supervising Pharmacist.

37. The defendants PETER KHAIM and ARKADIY KHAIMOV, together

with others, then submitted and caused the submission of false and fraudulent New York

Pharmacy Applications for the Scheme Pharmacies that (a) made false representations about the

ownership of the Scheme Pharmacies and failed to disclose KHAIM and KHAIMOV's roles as

owners, officers, partners, members and principal stockholders of the Scheme Pharmacies; and

(b) made false and fraudulent representations that certain licensed pharmacists were the

Supervising Pharmacists of the Scheme Pharmacies, even though the licensed pharmacists did

not carry out the roles and responsibilities of a Supervising Pharmacist as required by New York

State law.

11

38.     As the effects of the COVID-19 pandemic began to be felt in the United States, the defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, capitalized on the national emergency for their own financial gain by using the Emergency Override Code and the relaxation of the Refill-Too-Soon Edits to submit additional false and fraudulent claims for Targretin Gel 1% and Panretin Gel 0.1% that were never dispensed by the Scheme Pharmacies.

39.     While the Emergency Override Code was designed to ensure that beneficiaries received access to needed medications during the COVID-19 public health emergency, and as the New York metropolitan area became the epicenter of the COVID-19 outbreak in the United States in the spring of 2020, the defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, fraudulently caused an exponential increase in the number and value of claims that were submitted by the Scheme Pharmacies for Targretin Gel 1% and Panretin Gel 0.1%. KHAIM AND KHAIMOV fraudulently submitted and caused the submission of claims for Targretin Gel 1% and Panretin Gel 0.1% that were not actually dispensed by (a) inappropriately overriding the requirement of the Prescription Drug Plans that the Scheme Pharmacies receive prior authorization before being reimbursed for purportedly dispensing Targretin Gel 1% and Panretin Gel 0.1%; and (b) fraudulently overriding the Refill-Too-Soon Edits of the Prescription Drug Plans in order to submit claims for multiple 30-day supplies of Targretin Gel 1% and Panretin Gel 0.1% that were purportedly dispensed to a single beneficiary. As a result, payments by the Prescription Drug Plans to the Scheme Pharmacies correspondingly spiked in the months after the declaration of the COVID-19 public health emergency. For example, payments for Targretin Gel 1% to one of the Scheme Pharmacies, Zone Pharmacy, increased from an average of under $12,000 per month in the nine months

12

preceding COVID-19 to nearly $2 million per month from approximately March 2020 to May 2020.

40.     The defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, submitted and caused the submission, including by interstate wire, of fraudulent claims for prescription drugs purportedly dispensed by the Scheme Pharmacies.   The prescription drugs KHAIM and KHAIMOV sought reimbursement for were never in fact: (a) purchased or stocked by the Scheme Pharmacies; (b) dispensed by the Scheme Pharmacies to beneficiaries; (c) prescribed by the medical professionals who were represented to have authorized and prescribed them; and (d) medically necessary and reasonable.   These prescriptions included, among other things, Targretin Gel 1% and Panretin Gel 0.1%.

41.     The defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, also submitted and caused the submission, including via interstate wire, of fraudulent claims for prescription drugs, including Targretin Gel 1% and Panretin Gel 0.1%, that were purportedly dispensed by the Scheme Pharmacies during time periods that the Scheme Pharmacies were defunct, non-operational, not licensed, without employees and not supervised by a Supervising Pharmacist as required by New York State law.

42.     Moreover, the defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, sought to conceal and disguise the scheme by, among other things, (a) creating and causing the creation of the Pass-Through Entities and assigning names to certain of the Pass-Through Entities to make them appear to be legitimate pharmaceutical wholesale companies; (b) creating and causing the creation of false references on checks to invoice numbers to make it appear as if the checks were used by the Scheme Pharmacies to purchase pharmaceutical drugs from the Pass-Through Entities when, in fact, they were not; and (c)

transferring funds from the Scheme Pharmacies to the Pass-Through Entities that were purported payments for pharmaceutical drugs, including Targretin Gel 1% and Panretin Gel 0.1%, purportedly dispensed by the Scheme Pharmacies to the Pass-Through Entities, when, in fact, no drugs were purchased or dispensed.

43.     The defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, submitted and caused the submission, including via interstate wire, of over $39 million in claims for Targretin Gel 1% and $6 million in claims for Panretin Gel 0.1% to the Prescription Drug Plans, including claims that were medically unnecessary and not ordered by a medical professional, as represented in the submitted claims, and never provided to the beneficiary by the Scheme Pharmacies.

B.     The Money Laundering Scheme

44.     From in or about and between September 2019 and August 2020, the defendants PETER KHAIM and ARKADIY KHAIMOV, along with others, caused Money Launderer 1 to create or otherwise establish or acquire the Pass-Through Entities to further their fraudulent scheme.   KHAIM and KHAIMOV, together with others, assigned names to certain of the Pass-Through Entities to closely resemble the names of real pharmaceutical wholesale companies.   Moreover, KHAIM and KHAIMOV, together with others, paid and caused payments to be made to various individuals to open bank accounts for the Pass-Through Entities. In order to open the bank accounts, the individuals made false statements to financial institutions and others about the ownership of the Pass-Through Entities.

45.     The defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, concealed and disguised the nature, location, source, ownership and control of the proceeds from the fraudulent scheme by causing the transfer of the fraud proceeds from the

14

Scheme Pharmacies to the Pass-Through Entities, from which KHAIM, KHAIMOV and their co-conspirators sent money to other bank accounts in the United States and abroad.

46.     The defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, also created and caused the creation of references on checks for payment of fabricated or non-existent invoices to make it appear like the Scheme Pharmacies were purchasing pharmaceutical drugs from the Pass-Through Entities when they in fact were not.

47.     In the first phase of the scheme, PETER KHAIM and ARKADIY KHAIMOV, along with others, dissipated, transformed and concealed the nature, source, location, ownership, control and origin of the fraud proceeds by causing the Pass-Through Entities to wire funds to companies in China to pay for goods purportedly ordered by businesses in Uzbekistan. These funds were in turn used to pay certain individuals in Uzbekistan who were designated by customers of an unlicensed money services business in Queens, New York. In exchange, KHAIM and KHAIMOV, along with others, received a corresponding amount of cash from Money Launderer 1, minus a commission, that was supplied by members of the Uzbek community to the unlicensed money services business for transfer to certain individuals in Uzbekistan.

48.     In the second phase of the scheme, when the reimbursements paid by the Prescription Drug Plans for Targretin Gel 1% and Panretin Gel 0.1% exceeded the amount of cash available to the unlicensed money services business, the defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, including Money Launderer 1, dissipated, transformed and concealed the nature, source, location, ownership, control and origin of the fraud proceeds by causing the nominee account signatories on the Pass-Through Entities to (a) withdraw cash and have it delivered, at times in the middle of the night, to KHAIMOV and his

15

relatives; and (b) purchase millions of dollars in certified checks and write personal checks made payable to KHAIMOV and KHAIM, their relatives, other individuals designated by KHAIMOV and companies under KHAIMOV and KHAIM's control.

49.    The defendants PETER KHAIM and ARKADIY KHAIMOV dissipated the fraud proceeds by transferring such proceeds to family members and others, investing such proceeds in real estate located in the United States and abroad and purchasing jewelry and other luxury items.

## COUNT ONE
(Conspiracy to Commit Health Care Fraud and Wire Fraud)

50.    The allegations contained in paragraphs one through 49 are realleged and incorporated as if fully set forth in this paragraph.

51.    In or about and between October 2018 and December 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, did:

(a)    knowingly and willfully conspire to execute a scheme and artifice to defraud one or more health care benefit programs, as defined in Title 18, United States Code, Section 24(b), to wit: the Prescription Drug Plans, and to obtain by means of one or more materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347; and

(b)    knowingly and intentionally conspire to devise a scheme and artifice to defraud the Prescription Drug Plans, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises,

16

and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communications in interstate commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
(Conspiracy to Commit Money Laundering)

52.     The allegations contained in paragraphs one through 49 are realleged and incorporated as if fully set forth in this paragraph.

53.     In or about and between September 2019 and December 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants PETER KHAIM and ARKADIY KHAIMOV, together with others, did knowingly and intentionally conspire to commit offenses under Title 18, United States Code, Sections 1956 and 1957, to wit:

(a)     to conduct and attempt to conduct financial transactions involving the proceeds of one or more specified unlawful activities, to wit: (i) wire fraud, in violation of Title 18, United States Code, Section 1343; (ii) health care fraud, in violation of Title 18, United States Code, Section 1347; and (iii) conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(l)(B)(i);

(b)     to transport, transmit and transfer, and attempt to transport, transmit and transfer monetary instruments and funds from a place in the United States to and

17

through a place outside of the United States, knowing that the monetary instruments and funds

involved in the transportation, transmission and transfer represented the proceeds of some form

of unlawful activity, and knowing that such transportation, transmission and transfer was

designed in whole and in part to conceal and disguise the nature, location, source, ownership and

control of the proceeds of the specified unlawful activity, to wit: (i) wire fraud, in violation of

Title 18, United States Code, Section 1343; (ii) health care fraud, in violation of Title 18, United

States Code, Section 1347; and (iii) conspiracy to commit health care fraud, in violation of Title

18, United States Code, Section 1349, contrary to Title 18 United States Code, Section

1956(a)(2)(B)(i); and

          (c)     to engage and attempt to engage in one or more monetary

transactions in criminally derived property of a value greater than $10,000 and derived from one

or more specified unlawful activities, to wit: (i) wire fraud, in violation of Title 18, United States

Code, Section 1343; (ii) health care fraud, in violation of Title 18, United States Code, Section

1347; and (iii) conspiracy to commit health care fraud, in violation of Title 18, United States

Code, Section 1349, contrary to Title 18, United States Code, Section 1957.

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNTS THREE THROUGH SIX
(Concealment Money Laundering)

54.     The allegations contained in paragraphs one through 49 are realleged and

incorporated as if fully set forth in this paragraph.

55.     On the dates set forth below, within the Eastern District of New York and

elsewhere, the defendants PETER KHAIM and ARKADIY KHAIMOV, together with others,

did knowingly and intentionally conduct and attempt to conduct one or more financial

transactions affecting interstate and foreign commerce, which financial transactions involved the

18

proceeds of one or more specified unlawful activities, to wit: (i) wire fraud, in violation of Title 18, United States Code, Section 1343; (ii) and health care fraud, in violation of Title 18, United States Code, Section 1347, knowing that the property involved in such transactions represented the proceeds of some form of unlawful activity, and knowing that such transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of one or more of the specified unlawful activities, as set forth below:

| Count | Defendant | Approximate Date | Transaction |
|---|---|---|---|
| THREE | PETER KHAIM | May 18, 2020 | Deposit of a cashier's check number 1371712276 in the approximate amount of $280,000 into account number ending in 7356, belonging to PETER KHAIM, and drawn on account number ending in 1955 |
| FOUR | PETER KHAIM | January 13, 2020 | Deposit of check number 100 in the approximate amount of $20,000, and drawn on Zone Pharmacy account number ending 2008 |
| FIVE | ARKADIY KHAIMOV | April 17, 2020 | Deposit of a cashier's check number 115678669 in the approximate amount of $200,000 into account number ending in 6644, belonging to ARKADIY KHAIMOV, and drawn on the account of Company 1, an entity the identity of which is known to the Grand Jury |
| SIX | ARKADIY KHAIMOV | May 28, 2020 | Transfer of approximately $1,000,000 from account number ending 6644, belonging to ARKADIY KHAIMOV, to account number ending in 7707, belonging to Relative 1, a relative of ARKADIY KHAIMOV whose identity is known to the Grand Jury |

(Title 18, United States Code, Sections 1956(a)(1)(B)(i), 2 and 3551 et seq.)

COUNT SEVEN
(Aggravated Identity Theft)

56.     The allegations contained in paragraphs one through 49 are realleged and incorporated as if fully set forth in this paragraph.

57.     In or about and between March 2020 and May 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant PETER KHAIM, together with others, during and in relation to the crime charged in Count One, did knowingly and intentionally transfer, possess and use, without lawful authority, any means of identification of one or more other person, to wit: John Doe, an individual whose identity is known to the Grand Jury, knowing that the means of identification belonged to another person.

(Title 18, United States Code, Sections 1028(A)(a)(1), 1028A(b), 1028A(c)(5), 2 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

58.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(7), which requires any person convicted of a federal health care offense to forfeit property, real or personal, that constitutes, or is derived directly or indirectly from, gross proceeds traceable to the commission of such offense.

59.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a)     cannot be located upon the exercise of due diligence;

    (b)     has been transferred or sold to, or deposited with, a third party;

    (c)     has been placed beyond the jurisdiction of the court;

20

       (d)     has been substantially diminished in value; or

       (e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

               (Title 18, United States Code, Sections 982(a)(7) and 982(b)(1); Title 21, United

States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS TWO THROUGH SIX

       60.     The United States hereby gives notice to the defendants that, upon their

conviction of any of the offenses charged in Counts Two through Six, the government will seek

forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any

person convicted of such offenses to forfeit any property, real or personal, involved in such

offenses, or any property traceable to such property.

       61.     If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

       (a)     cannot be located upon the exercise of due diligence;

       (b)     has been transferred or sold to, or deposited with, a third party;

       (c)     has been placed beyond the jurisdiction of the court;

       (d)     has been substantially diminished in value; or

       (e)     has been commingled with other property which cannot be divided

without difficulty;

21

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
MARK J. LESKO
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

_____
DANIEL KAHN
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

22

F. # 2020R01145

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*PETER KHAIM*
*and*
*ARKADIY KHAIMOV,*

Defendants.

# SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 982(a)(1), 982(a)(7), 982(b)(1), 1028A(a)(1), 1028A(b),
1028A(c)(5), 1349, 1956(a)(1)(B)(i), 1956(h), 2 and 3551 et seq.; T. 21,
U.S.C., § 853(p))

*A true bill.*

*Foreperson*

*Filed in open court this _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ day,*

*of  _ _ _ _ _ _ _ _ _ _ _ _    A.D. 20 _ _ _ _ _*

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Clerk*

*Bail, $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _*

**Andrew Estes, Trial Attorney (718) 254-6250**

23